IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATSE FOR: | |
| A SEARCH WARRANT FOR THE RESIDENCE LOCATED AT 613 HIGHLAND AVENUE, PITCAIRN, PA 15140 | Magistrate No. 19·2319<br>[UNDER SEAL] |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, Brianna Maria Tetrault, having being duly sworn, depose and state as follows:

1. I, BRIANNA MARIA TETRAULT, am a Special Agent of Homeland Security Investigations (HSI) Immigration and Customs Enforcement (ICE), United States Department of Homeland Security. As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States, who is empowered by law to conduct investigations of, and make arrests for, controlled substance offenses enumerated in Title 21, United States Code.

2. I am currently assigned to the HSI Pittsburgh Office of the Assistant Special Agent in Charge in the Contraband Smuggling Group and have been so employed since June 2010. As a Special Agent, I am authorized to conduct investigations of alleged violations of Immigration laws and Customs laws, including offenses involving the importation of prohibited items, such as narcotics, under Titles 18, 19, and 21 of the United States Code. While being trained as a Special Agent of the HSI, your affiant has received basic training at the Federal Law Enforcement Training Center located in Glynco, Georgia. Your affiant has participated in a number of narcotics and money

laundering investigations, which have resulted in the seizure of illegal drugs and evidence of drug violations, as well as the seizure of assets acquired with drug proceeds. Your affiant has conducted covert surveillance of suspected drug traffickers on numerous occasions, interviewed numerous individuals involved in the drug trafficking trade, participated in a Title III wiretap investigation, participated in the execution of numerous search and arrest warrants, assisted in the arrest of narcotics traffickers, and assisted in the seizure of controlled substances. Based upon the above experience, your affiant is familiar with the modus operandi of persons involved in illicit distribution of controlled substances, as well as the terminology used by persons involved in the illicit distribution of controlled substances. Your affiant is aware that persons involved in the illicit distribution of controlled substances routinely attempt to conceal their identities, as well as the location at which drug transactions take place.

3. I previously worked for the Pennsylvania Office of Attorney General, Bureau of Consumer Protection, from June 2006 to May 2010. As a Consumer Protection Agent, I investigated and enforced Pennsylvania Consumer Protection Laws. In 2006, I received a Bachelor' of Arts degree in Government and History from Arcadia University in Glenside, Pennsylvania.

4. The facts and information contained in this affidavit are based upon my personal participation in this investigation and information provided by other law enforcement officers involved in this investigation.

5. I make this affidavit in support of an application for a Search Warrant for the residence located at 613 Highland Avenue, Pitcairn, PA 15140, ("**TARGET RESIDENCE**"). The

**TARGET RESIDENCE** is further described as a two-story, multi-family yellow brick residence, with a driveway and an upper floor deck to the right of the residence. A white door marked 613 is at the far right of the front of the residence. The number "613" is written above the door. There is a mailbox affixed to the brick, to the left of that door.

6.   In a substantial number of residential searches executed in connection with the drug investigations in which I and fellow HSI Agents and State Police Officers have been involved, the following kinds of drug-related evidence have typically been recovered from the residences of drug-traffickers:

- Controlled substances, such as marijuana and cocaine;

- Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants such as mannitol, inositol and other similar substances;

- Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

- Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

- Cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example: money orders, wire transfers (Western Union), cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers;

3

- Documents indicating travel such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, telephone bills and rental car agreements;

- Computers and mobile electronic communication devices, such as cellular telephones;

- Firearms and other dangerous weapons; and

- Photographs, in particular, photographs of co-conspirators, assets, firearms and/or drugs.

7. In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in the residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, utility and telephone bills, statements, identification documents, and keys to safe deposit boxes and storage facilities.

8. Based upon my training and experience, as well as the knowledge and experience of other agents and police officers involved in this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (as described above) in their residences. Further, it is generally a common practice for drug traffickers to maintain in their residence(s) and/or their business records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their

4

suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

9. Based upon my training and experience, I also am aware that it is a generally common practice for traffickers to conceal at their residences and/or their business large sums of money, either the proceeds from drug sales or money to be used to purchase controlled substances. Drug traffickers must maintain on hand the large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences and/or their business.

10. Based upon my training and experience, that drug traffickers commonly have in their possession that is on their person, at their residences and/or their business, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. I also am aware that, typically, drug traffickers possess these firearms and other dangerous weapons to protect their profits, supply of drugs, and themselves from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

11. Further, I am aware that narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Furthermore, I know that the aforementioned books, records, receipts, notes, ledgers, etc. are generally maintained where the traffickers have easy and ready access to them, including in their residences, businesses, and automobiles.

12. Further, I am aware that persons involved in significant drug trafficking, conceal in their residences, businesses, and automobiles, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from narcotic trafficking activities.

13. When drug traffickers amass proceeds from the sale of drugs, drug traffickers often attempt to legitimize these profits, or otherwise conceal them from discovery by law enforcement officers. To accomplish these goals, drug traffickers often use different techniques, including but not limited to foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, the purchase of real estate, as well as shell corporations and business fronts to conceal the true ownership and illegal source of the proceeds.

14. Further, I am aware that narcotic traffickers commonly maintain books or papers that reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; that narcotic traffickers take or cause to be taken photographs of them, their associates, their

6

property, and their product; and that these traffickers usually maintain these photographs in their possession.

15. Further, I am aware that narcotic traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing narcotics; and the paraphernalia would include, but are not limited to scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution.

16. Further, I am aware that narcotic traffickers often operate under assumed names in order to conceal their true identities from law enforcement officers. In so doing, they acquire property, services, and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names; and that they maintain such documents as evidence of their false identities in their residences, businesses, and automobiles together with evidence of their true identities.

17. I have knowledge that drug traffickers commonly conceal their activities from members of the public by transacting their business in a convert manner and frequently conducting their business during the nighttime hours when darkness helps conceal their activities. Moreover, it is highly unusual for individuals primarily engaged in drug trafficking activities to associate in their businesses or social activities with others not engaged in the same drug trafficking activities.

18. I have knowledge that it is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence and/or their business, for their ready access and to conceal them from law enforcement authorities.

19. My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following:

- My own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described;

- My involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations;

- Discussion with other members of HSI and law enforcement officers, both about the facts of this case in particular and about trafficking in general; and

- Other intelligence information provided through law enforcement channels.

20. I have the following additional information from my participation in the instant investigation and from my conversations with other law enforcement officers involved in this investigation.

**PROBABLE CAUSE**

21. Your Affiant has been conducting an investigation of a large-scale Drug Trafficking Organization into individuals primarily from Jamaica who are involved with drug trafficking, money laundering, marriage fraud, and other violations in and around the Pittsburgh area. During the course of this investigation, your Affiant became aware that Jasmine HARDIN is an associate of this organization.

22. Throughout the investigation, investigators from HSI, the Pennsylvania State Police (PSP), the United States Postal Inspection Service (USPIS), and the Drug Enforcement Administration (DEA), as well as other agencies, have participated in multiple cases involving Jamaican and United States Citizens (USC) committing various offenses and appearing to be a part of the Organization.

23. Your Affiant directly participated in the PA State and Federal arrests of the USC Latisha BUTLER who is now married to a Jamaican Citizen, Aaron THOMPSON. BUTLER was arrested by PSP for drug trafficking in 2016, and she was ultimately convicted. It is believed that a shipment of marijuana that BUTLER was arrested for, was arranged for by her-then boyfriend and now husband, THOMPSON.

24. After the initial arrest of BUTLER for possession with intent to deliver a controlled substance, she was again arrested during the ongoing investigation. On May 10, 2018, your Affiant applied for and obtained a Federal search warrant for BUTLER's residence, which she shared with THOMPSON, which was read and approved by Chief US Magistrate Judge Maureen P. Kelly at Magistrate No. 18-615. The basis for the affidavit was the belief that BUTLER is also involved in money laundering, most likely for, or on behalf of, THOMPSON and the Organization. During the course of the search warrant, multiple firearms were located and seized from the residence. BUTLER became a convicted felon from her 2016 arrest and is therefore a prohibited person. BUTLER has since pleaded guilty to being a felon in possession of firearms (18 U.S.C. § 922(g)(1)) and is awaiting sentencing.

9

25. During the continued investigation, Racoco WILLIAMS, a Jamaican citizen, was arrested in a hotel in Monroeville, PA on August 29, 2017, after a search of his hotel room revealed 17 kilograms of cocaine and approximately $192,854.00 in US currency. Based on interviews of numerous subjects and real estate documents obtained via Grand Jury subpoenas, it is believed that WILLIAMS and THOMPSON are associates and partners in the drug trafficking organization.

26. An earlier search warrant in 2017 of a residence in the Pittsburgh area is also related to the Organization. A search warrant at the residence of another associate of WILLIAMS' was based on nearly identical circumstances as the BUTLER search warrant in 2016. Law enforcement identified a suspicious package, obtained a search warrant for it, and that search warrant revealed that the package contained marijuana. Law enforcement then obtained a search warrant for the residence to which the package was addressed, and that search revealed not only the marijuana, but approximately six kilograms of cocaine and approximately $76,000 in cash. All the five individuals located within this residence were born in Jamaica.

27. Subsequent search warrant of cellular telephones found in the residence established the connection between one of the residents and WILLIAMS.

28. In between the two search warrants in 2017, the Swissvale Police Department also found WILLIAMS with approximately $100,000 in cash during a traffic stop and a search of his hotel room.

29. WILLIAMS has since been indicted for multiple counts, to include conspiracy to commit money laundering, possession with the intent to distribute cocaine, participating in a

continuing criminal enterprise as principal administrator that involves 150 kilograms or more of cocaine, among other charges. He is awaiting trial.

30.     Your Affiant along with PSP Trooper/HSI Task Force Office (TFO) Dan Beatty have been investigating the Organization and have interviewed numerous subjects who have explained in great detail the way in which the Organization operates, in addition to identifying those who are involved. Interviews and the investigation have revealed that subjects, mainly female USCs, perform air travel on behalf of the Organization. Oftentimes the subjects are provided very little notice in which to book a flight, usually only one or two days before the flight. Then the subject will usually fly with a suitcase(s) that has been provided to them by the Organization. Based on arrest information and your Affiant's training and experience, the subject's most likely travel with currency, west-bound to Phoenix, AZ, where investigators know that WILLIAMS used to have a home. The subjects then travel with narcotics east-bound to Pittsburgh, PA, New York, Atlanta, GA, and other places both known and unknown. This information has been substantiated with travel records, interviews, and arrests. Your Affiant is also aware that many of the subjects live in the Pittsburgh and Phoenix areas.

31.     Your Affiant became aware that Jasmine HARDIN, a USC who lives in the Pittsburgh area, is be part of the Organization from confidential sources outlined below. Your Affiant sent numerous Department of Homeland Security (DHS) Administrative Subpoenas to multiple airlines to obtain travel records. Your Affiant has so far received records from Southwest Airlines, American Airlines, and Expedia which show travel for HARDIN. Your Affiant is also

11

aware that some airlines only keep records for a short period of time. HARDIN has approximately 10 trips via Southwest and American Airlines carriers in 2016-17. Expedia shows several additional trips during the same time period. HARDIN's travel matches that of the Organization: most of the flights were booked within a couple of days of travel and travel was to known locations for the Organization: Las Vegas, Phoenix, Atlanta, and other locations.

32.     Your Affiant is aware based on interviews of confidential informants as corroborated by other investigative means, that the Organization has many people who maintain the various jobs. Some people fly the drugs and money to and from the various locations, some people retrieve drugs shipped in the mail, some people drive the travelers to and from the airport, etc. During the course of the investigation, I and other investigators interviewed a confidential source (CS1). CS1 provided information pursuant to an informal immunity letter. CS1 provided the information in hopes of avoiding prosecution. CS1 has a minimum criminal history with convictions for intimidation of a witness and terroristic threats. CS1 admitted that she was a member of the organization. When s/he was under the age of 21, s/he retrieved parcels (similar to the search warrants mentioned above), and would deliver them to another member of the organization. CS1 admitted to working for both THOMPSON and WILLIAMS, among other people. CS1 said that once s/he got older, they moved to airline travel and transported suitcases again for both THOMPSON and WILLIAMS, among others. This information is believed to be reliable because it was corroborated by other confidential sources and through other investigative means, including review of travel records and search warrants.

12

33. Investigators interviewed another confidential source (CS2). CS2 provided information pursuant to an informal immunity letter. CS2 provided the information in hopes of avoiding prosecution. CS2 has a minimal juvenile criminal record, but no adult convictions. CS2 admitted to his/her involvement in the organization, and that s/he worked for WILLIAMS and THOMPSON, among other known members of the organization. CS2 further states that s/he recruited HARDIN to participate and would often arrange travel for HARDIN on behalf of the Organization. The information from CS2 is believed to be reliable because it was corroborated by other confidential sources and through search warrant and travel records, including the travel records associated with HARDIN.

34. Your Affiant is aware that HARDIN only has a minimal work history reported to the PA Department of Labor and Industry: only one quarter of reported work in each year: 2015-17, but not work reported in either 2018 and 2019. Your Affiant is aware that airfare purchased on the day of, or within a few days of travel is generally more expensive than a trip planned in advance. HARDIN's air travel is consistent with the Organization's travel, whereas someone else was most likely paying for her trips. Thus, based on her employment history, it does not appear that Hardin had a legitimate means of paying for the travel herself, at least from employment income.

35. Your Affiant conducted a query of HARDIN's criminal records. Your Affiant is aware that HARDIN has multiple arrests for assaults and drugs. HARDIN's most recent arrest was listed on April 12, 2018, for the violation of a small amount of marijuana. HARDIN was also

arrested in 2017, for a small amount of marijuana and possessing a controlled or counterfeit substance.

36. Your Affiant obtained information from a third confidential source (CS3) who has provided accurate and reliable information for several years that has been corroborated through independent investigative means, including search warrants, subpoenas, and interviews. CS3 is in this Country illegally and s/he was arrested administratively. S/he is cooperating in hopes of obtaining status to remain in the United States legally and has no known criminal history.

37. CS3, over the last several weeks, provided information to your Affiant that HARDIN lives at the **TARGET RESIDENCE**. This information is recent and believed to be accurate based on the indicia that was found in the first trash pull discussed below. CS3 also stated that HARDIN, based on interactions with HARDIN and overhearing HARDIN's conversation, is engaged in packaging narcotics for those distributing narcotics. In addition, according to CS3, HARDIN is selling firearms to others otherwise unable to purchase firearms. CS3 is privy to this information because she knows an individual who purchased a firearm from HARDIN, and CS3 spoke to other individuals who stated to CS3 that HARDIN was selling firearms.

38. On October 3, 2019, your Affiant and TFO Beatty conducted a "trash pull" at 613 Highland Ave., Pitcairn, PA, the **TARGET RESIDENCE** and the residence where HARDIN is believed to reside. Trash was observed in several trash cans discarded at the edge of the driveway in the alley. At approximately 1400 hours, investigators observed the trash truck come around the corner in front of the residence, moving through the alley. Investigators approached the employees,

14

identified themselves, and explained the request for the trash from 613. The employees relayed that they had a clean hopper and would collect the trash from 613 and then meet investigators at the end of the block.

39. Investigators watched as the employees collected the trash from 613 and then followed them to the end of the block to collect it. Investigators then traveled with the trash to the Pitcairn Borough building in order to go through it. Within one specific bag was a piece of indicia: a shipping label: in the name "Hardin Jazmine", for apartment 2, in addition to multiple black latex gloves, a corner from a vacuum sealed bag, a gun holster, and numerous gift cards. In other bags, investigators located more black latex gloves and gift cards as well as a receipt for a money transfer. Investigators are aware that the gloves and the corner of the vacuum sealed bag are often associated with from the packaging and/or distribution of narcotics. Further, based on my training and experience, I am aware that gift cards is a method drug traffickers use to launder cash proceeds from illicit activities. Thus, based on my training and experience, the evidence gathered from the trash pull is consistent with HARDIN's involvement with the drug trafficking organization.

40. Your Affiant is aware that HARDIN is not a felon and therefore not a prohibited person. Your Affiant, however, conducted a query with the Bureau of Alcohol, Tobacco, and Firearms (ATF). The ATF's database showed that HARDIN does not have a concealed carry permit. Further, HARDIN is not registered as having any firearm purchases listed in the Pennsylvania State Police system, but that system is not completely up to date.

41. Your Affiant checked with the United States Postal Service (USPS) about the parcel that read apartment 2 referred to above that was contained with the trash. USPS confirmed that the building has two apartments but they are numbered 613 and 623 Highland Avenue, however 613 is sometimes referred to as apartment 2.

42. On November 7, 2019, your Affiant and TFO Beatty conducted another "trash pull" at 613 Highland Ave., Pitcairn, PA -- the **TARGET RESIDENCE**. Trash was observed in several trash cans discarded at the edge of the driveway in the alley. At approximately 1210 hours, investigators observed the trash truck.

43. Investigators watched as the employees collected the trash from 613 and then followed them to the end of the block to collect it. Investigators then traveled with the trash to the Pitcairn Borough building in order to go through it. Investigators identified the bags that again appear to belong to the **TARGET RESIDENCE:** the bags had different colored ties. The trash bags with orange ties were found to have indicia for 623 Highland Avenue. The trash bags with blue ties were found to have similar trash as the last trash pull: there were many prepaid gift cards, at least one plastic glove, and a money transfer. Further, two marijuana roach cigarettes were found in the trash. Investigators believe these to be marijuana cigarettes based on investigators' training and experience and the fact that the roach cigarettes smelled of marijuana.

44. Your Affiant believes there could be narcotics inside the residence and your Affiant believes there will be evidence of narcotics packaging paraphernalia, communications, and other paperwork that will provide additional evidence concerning the Organization. Based on my training

16

and experience, your Affiant believes there will be cash proceeds also at the **TARGET RESIDENCE**. Based on the above-mentioned information, this officer respectfully requests that a search warrant be granted for the **TARGET RESIDENCE**, 613 Highland Avenue, Pitcairn, PA 15140.

45.     Based on all of the above, I submit that there is probable cause to believe that this is currently within the **TARGET RESIDENCE** evidence of violations of Title 21, United States Code Sections 844 (Possession of Controlled Substances), 846 (Conspiracy to Distribute Controlled Substances) and of Title 18, United States Code, Section 1956 (Money Laundering), including the items set forth in Attachment A to the warrant.

The above information is true and correct to the best of my knowledge, information and belief.

Brianna M. Tetrault
Special Agent
Homeland Security Investigations

Sworn and subscribed to before me this ___ day of November 2019.

Patricia L. Dodge
U.S. Magistrate Judge

17

## ATTACHMENT A

### Property to be Searched

**613 Highland Avenue, Pitcairn, Pennsylvania 15140** is further described as a two-story, multi-family yellow brick residence, with a driveway and an upper floor deck to the right of the residence. A white door marked 613 is at the far right of the front of the residence. The number "613" is written above the door. There is a mailbox affixed to the brick, to the left of that door.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Evidence of illegal drug-trafficking, in violation of Title 21, United States Code Sections 844 (Possession of Controlled Substances), 846 (Conspiracy to Distribute Controlled Substances) and of Title 18, United States Code, Section 1956 (Money Laundering), including, but not limited to the following:

a. controlled substances, such as marijuana and cocaine;

b. paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and dilutants such as mannitol, inositol and other similar substances;

c. books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

d. personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

e. cash, currency, and records relating to controlled substances income and expenditures of money and wealth, for example: money orders, wire transfers (Western Union), cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers;

f. documents indicating travel such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, telephone bills and rental car agreements;

g. computers and mobile electronic communication devices, such as cellular telephones;

       h.     firearms, ammunition, and other dangerous weapons; and

       i.     photographs, in particular, photographs of co-conspirators, assets, firearms and/or drugs.